## Commonwealth v. Rosier.

*Homicide—Degrees of murder—Manslaughter—Insanity.*

1. The wilful, deliberate and premeditated killing of a human being with malice aforethought, express or implied, is murder of the first degree.

2. Where there is a purpose and intention to kill existing in the mind of one who takes the life of another, it is wilful; if he is entirely conscious of such a purpose and design, it is deliberate; if he has had time fully to form the design, it is premeditated. In the kind of murder of the first degree, described as wilful, deliberate and premeditated, there must be a fully formed purpose to kill, with so much time for deliberation and premeditation as to convince the jury that this purpose is not the immediate offspring of rashness and impetuous temper, and that the mind has become fully conscious of its own design.

3. One who uses a deadly weapon upon another at some vital part with manifest intention to use it upon him must, in the absence of qualifying facts, be presumed to know that his act is intended to kill and must be presumed to intend death, provided that there is sufficient time for deliberation and fully to form the conscious purpose of killing.

4. Murder of the second degree is where there is an unlawful killing, the outcome of a wicked and depraved heart, but where no purpose to kill has been shown by the evidence, and such purpose cannot be reasonably inferred from the attending circumstances.

5. Malice exists in both degrees of murder, but the distinction between them is that in murder of the first degree there is a design to kill, and in murder of the second degree a design to do harm, but not to kill.

6. Manslaughter is any unlawful killing without malice aforethought, as when one strikes another and death results from the blow, although death was not intended. To make killing manslaughter, it is necessary that the circumstances should take away every evidence of cool depravity of heart or of wanton cruelty. To reduce the infliction of a gun-shot wound, resulting in death, to manslaughter, there must be sufficient cause of provocation and a state of rage or passion, without time to cool, placing the person beyond the control of his reason and suddenly impelling him to the deed.

7. It is the duty of the jury to approach the consideration of the case before them on the assumption that the prisoner is innocent of the crime of murder with which she is charged, as in law she is presumed to be innocent until found guilty beyond a reasonable doubt, and the burden of proving her guilt beyond such doubt is upon the Commonwealth.

8. Reasonable doubt is such doubt as would cause a reasonable man in the conduct of the usual and ordinary affairs of life to stop, hesitate and consider seriously whether he should do a certain thing before finally acting, and is much more serious than a possible doubt; for a possible doubt exists in all things, and it is almost impossible to come to any conclusion to a certainty beyond a possible doubt. If the jury cannot find matter in or from the evidence on which to base the doubt, then it is not a reasonable, but a possible doubt, and would not justify a conscientious juror in hesitating to render a verdict of guilty where his mind is fairly satisfied except for the existence of such doubt. Any conclusion which the jury may reach which satisfies the reason and the judgment to a moral certainty is a sufficient conclusion upon which to found a verdict. Sympathy or compassion must not play any part in raising a reasonable doubt; the doubt must be a cold, dispassionate one arising from the evidence, for, if the mind is fairly satisfied of a fact on the evidence as much so as would induce a man of reasonable fairness and judgment to take the fact as true and act upon it in a matter of importance to himself, it is sufficient to rest a verdict upon. When the jury's mind, after mature deliberation and earnest effort to arrive at the truth, cannot come to a satisfactory conclusion as to the existence of a certain fact, or as to its effect, then a reasonable doubt exists, to the benefit of which the prisoner is entitled.

9. The fact that the prisoner found the deceased in criminal conversation with her husband constitutes in itself no defence to an indictment for murder of the first degree, although that fact may be taken into consideration in determining how far, in view of her general mental condition, she was capable of forming a wilful, deliberate and premeditated purpose to kill.

10. The law of Pennsylvania does not tolerate a doctrine of transitory frenzy which does not amount to actual insanity, as a defence to a charge of murder.

11. To excuse the prisoner on the ground of insanity—and the burden of proving

Commonwealth *v.* Rosier.

insanity by fairly preponderating evidence is upon her—the jury must be convinced that at the time the fatal shot was fired her mind was so affected by disease that she did not know the nature and consequences of her act; *i. e.*, that she did not know that it was wrong and that she would be punished by law, or that she was so impelled by an insane impulse that she had no power whatever to resist. There is a distinction between an unsound mind and a condition of insanity which will excuse an illegal killing. If the prisoner had an unsound mind and yet knew the nature and quality of her act, knew that it was wrong and knew what she was doing at the time, she will be responsible under the law. Unless, therefore, her mind was so affected by disease that she could not control her actions, or unless her knowledge of what she was doing was destroyed, she is responsible.

12. Where the prisoner shot and killed her husband and the deceased at the same interview and substantially at the same time, and was indicted separately for the two homicides, was tried for killing the deceased and acquitted on the ground of insanity, that matter is *res adjudicata* as to the killing of her husband, and it is, therefore, proper for the Commonwealth to submit all bills of indictment for the latter homicide for verdicts of not guilty.

Charge to the jury. Q. S. Phila. Co., Feb. Sess., 1922, No. 289.

*Maurice J. Speiser*, Assistant District Attorney, for Commonwealth.

*John R. K. Scott* and *William T. Connor*, for defendant.

BARRATT, P. J., Nov. 3, 1922.—Gentlemen of the jury: You have now over a period of about twelve days in the taking of testimony and hearing arguments sat patiently in your seats in the jury-box, and I have noted your careful interest and attention to everything that has transpired in the case. You have heard from the lips of the witnesses, both upon the part of the Commonwealth of Pennsylvania and upon the part of the defendant, the narrative of the tragedy which it is your grave duty to solve. As you already know, the Commonwealth of Pennsylvania charges this young woman at the bar with the high crime of murder, and it is your solemn duty to pass upon the questions that have been raised. It now becomes my duty as the trial judge to place before you the law applicable to the various contentions, and then you take that law and apply to it the facts as you find them from the evidence, and in that way reach your conclusion upon the whole case.

There are certain facts in the case as to which you will have no difficulty whatever, since they are proved beyond any question, and are also admitted. It has been proved, and it is also an admitted fact in the case, that between 3 and 3.30 o'clock in the afternoon of Saturday, Jan. 21st of this year, a little over nine months ago, Catherine Rosier, the defendant at the bar, shot a .25-calibre ball from a revolver into the body of Mildred G. Reckitt, at a point in the upper right abdomen, as described by the doctors who testified upon the subject, and that from the wound thus inflicted Mildred G. Reckitt died within less than three hours. It is not at all disputed, in fact, I think that it is admitted, that Miss Reckitt at the time of her death was about eight days short of twenty years of age; that she was employed as a stenographer by the Rosier Advertising Agency; that the scene of the shooting was the office of Oscar Rosier, the president of the agency, in the suite of offices occupied by the advertising agency upon the third floor front of No. 1314 Walnut Street; that there were but three people present at the time of the shooting, namely, Mr. Rosier, Miss Reckitt and the defendant. The defendant admits the purchase by her, shortly prior to the tragedy, of the revolver and cartridges with which she did the shooting. It is also an admitted fact in the case that at the same time that Miss Reckitt was shot, Mr. Rosier also was shot by the defendant, and that, as a result of that shooting, Mr. Rosier is dead. These are facts in the case concerning which there is no dispute, so that you may take them as established.

2 D. & C.

### Commonwealth *v.* Rosier.

Before going with you into the evidence that has been presented, I will state to you the principles of law applicable to the various degrees of murder, so that you may have the law in mind upon the phases of the case as well. I will take them up briefly at a later point in my charge.

At common law but two grades of felonious homicide exist—murder and manslaughter. Murder, at common law, is where a person of sound mind, memory and discretion kills a reasonable creature in being in the peace of the Commonwealth with malice aforethought, expressed or implied. Manslaughter is any unlawful killing without malice aforethought, as when one strikes a person and death results from the blow, although not intended, or kills another in a fight arising upon a sudden quarrel or upon mutual agreement, or in the heat of passion or upon great provocation. It is distinguished from murder by the absence of malice.

The law of Pennsylvania with respect to the crime of murder provides: "All murder which shall be perpetrated by means of poison, by lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery or burglary, shall be deemed murder of the first degree, and all other kinds of murder shall be deemed murder of the second degree."

The Commonwealth of Pennsylvania in this case is asking for a conviction of the defendant of murder in the first degree. You will understand readily that the provision of our law concerning a killing which shall be committed "by means of poison," or "in the perpetration or attempt to perpetrate any arson, rape, robbery or burglary," is not applicable to your consideration of this case, since the killing here was not perpetrated by means of poison or in the commission or attempt to commit any of the crimes of arson, rape, robbery or burglary. The other provision of our law just quoted, namely, "by any other kind of wilful, deliberate and premeditated killing," which our law holds to be murder of the first degree, is the provision of our law upon which the Commonwealth asks you to find the defendant at the bar guilty. In other words, the Commonwealth charges that the killing of Miss Reckitt was done by the defendant with the wilful, deliberate and premeditated purpose to kill, and because the law of our State deems a killing under such circumstances to be murder of the first degree, you are asked by the Commonwealth to render such verdict in this case.

Where there is a purpose and intention to kill existing in the mind of one who takes the life of another, it is wilful. If he is entirely conscious of such a purpose and design, it is deliberate. If he has had time fully to form the design, it is premeditated. In the kind of murder in the first degree described as wilful, deliberate and premeditated, there must be the fully formed purpose to kill, with so much time for deliberation and premeditation as to convince the jury that this purpose is not the immediate offspring of rashness and impetuous temper, and that the mind has become fully conscious of its own design. One who uses a deadly weapon upon another at some vital part, with manifest intention to use it upon him, must, in the absence of qualifying facts, be presumed to know that his or her act is intended to kill, and must be presumed to intend death. A man or woman who uses a deadly weapon without sufficient cause of provocation must be presumed to do it wickedly or from a bad heart, and when he or she takes the life of another with a deadly weapon and with a manifest design to use it upon him, with sufficient time to deliberate and fully to form the conscious purpose of killing, he or she is guilty of murder of the first degree.

Murder of the second degree is where there is an unlawful killing, the out-

come of a wicked and depraved heart, but where no purpose to kill has been shown by the evidence, and such purpose cannot be reasonably inferred from the attending circumstances.

The difference between murder and manslaughter is this: Manslaughter is never attended by legal malice or depravity of heart, that condition or frame of mind exhibiting wickedness of disposition, recklessness of consequences or cruelty. To make killing manslaughter, it is necessary that the circumstances should take away every evidence of cool depravity of heart or of wanton cruelty. To reduce the infliction of a gun-shot wound, resulting in death, to manslaughter, there must be sufficient cause of provocation, and a state of rage or passion without time to cool, placing the person beyond the control of his reason and suddenly impelling him to the deed.

The intention to kill and the condition of mind which is essential to the offence of murder of the first degree, may be inferred from the use of a deadly weapon without provocation or from such circumstances as reasonably and properly justify such an inference and lead naturally and necessarily to that conclusion.

Malice exists in both degrees of murder, but the distinction between them is that in murder of the first degree there is a design to kill, and in murder of the second degree a design to do harm but not to kill. Malice is a term which includes not merely ill-will towards particular persons, but also all those cases wherein are manifested cruelty, wickedness and disregard of consequences, such as in the case of the use of a deadly weapon, as alleged here by the Commonwealth, because the law assumes that a person knows the ordinary consequences which will result from the use of a deadly weapon, and that death does result from its use, and if a deadly weapon is used, the law assumes that death was what was intended.

Manslaughter is any unlawful killing without malice aforethought, as when one strikes a person and death results from the blow, although not intended, or kills another in a fight arising upon a sudden quarrel or upon mutual agreement, or in the heat of passion, or upon great provocation. It is distinguished from murder by the absence of malice.

You will approach the consideration of the case with the assumption that the prisoner is innocent of the crime of murder with which she is charged, because in law she is presumed to be innocent until found guilty beyond a reasonable doubt, and the burden of proving to you her guilt beyond a reasonable doubt is upon the Commonwealth.

Now, what is a reasonable doubt? It is not merely any passing fancy that may come into the mind of a juror. It must be a doubt arising from the evidence—substantial, well-founded on reason and common sense. A reasonable doubt such as would be taken notice of by a juror in deciding a case, or a question in a case, is of the same nature as a doubt that would cause a reasonable man, in the conduct of his usual and ordinary affairs, to stop, hesitate and seriously consider as to whether he should do a certain thing before finally acting. It is something different and much more serious than a possible doubt; for a possible doubt exists in all things, and it is almost impossible to possess any human knowledge or to come to any conclusion to a certainty beyond a possible doubt. If the jury cannot find matter in or from the evidence on which to base the doubt, then it is not a doubt arising from the evidence—not a reasonable doubt, but simply a possible doubt—and not such a doubt as would justify a conscientious jury in hesitating in the rendition of a verdict where the mind is fairly satisfied, except for the exist-

2 D. & C.

ence of this doubt. Any conclusion which the jury might reach which satisfies the reason and judgment to a moral certainty is a sufficient conclusion upon which to found a verdict.

Sympathy or compassion must not play any part in raising doubt in the mind of the juror, but the doubt must be a cold, dispassionate one arising from the evidence, for, if the mind is fairly satisfied of a fact, on the evidence, as much so as would induce a man of reasonable fairness and judgment to take the fact as true and act upon it in a matter of importance to himself, it would be sufficient to rest a verdict upon; and a juror is not to speculate as to whether a matter established by the evidence to his satisfaction may not be otherwise. However, you are to take nothing for granted upon mere assertion, and when you honestly hesitate upon the question as to whether certain evidence establishes a given proposition; when your mind, after mature deliberation and earnest effort to arrive at the truth, cannot come to a satisfactory conclusion as to the existence of a certain fact, or as to its effect, then the doubt belongs to the prisoner.

We will now take up the law applicable to the defence that has been set up in this case. At the outset of my instructions to you at this time, I want to preface by saying that in a case such as you have here, where the sole defence is insanity, a defence of insanity is a good one if, by the preponderance of the proofs, it is made out to your satisfaction. You have had a great deal of evidence concerning brutal treatment of the defendant by her husband following the birth of a child of theirs a little more than three months prior to the shooting. You have heard a large number of witnesses narrate what the defendant told to them concerning her husband's treatment of her, his infatuation for and infidelity with Miss Reckitt, his threat to obtain a divorce from her either by fair means or foul; and the defendant's fear that her husband's brother Arthur was conspiring with her husband to find grounds for divorce, and all these other matters which you will remember so that it is unnecessary for me to repeat them. I instruct you, as matter of law, that none of these things alone would constitute in the law justification for the killing of Miss Reckitt. The defendant herself told you upon the stand that immediately prior to the shooting she caught her husband and Miss Reckitt in the act of illicit intercourse upon the sofa or lounge in her husband's private office. Even if you believe and find as a fact that this is true, the law does not justify or excuse her shooting Miss Reckitt because of that discovery. To hold otherwise would be to place in the hands of individuals the right to administer their own standards of law, not only in the findings of fact, but in the punishment for the offence. As you can very readily see, if this were permitted by your laws, no one would be safe, there would be no orderly existence, lawlessness and anarchy would result and civilization would of necessity tend to a reversion to barbarism. Therefore, the fact, if it be a fact, that the defendant suffered wrongs and indignities at the hands of her husband for a period of three months, or any other period, prior to the shooting; and even if, in addition, caught her husband and Miss Reckitt in the actual commission of illicit and criminal intercourse, neither one nor all of those things would, in the eye of the law, justify the defendant in having taken the law into her own hands and firing the fatal ball into Miss Reckitt's body. At most, a carnal relation, if it actually did exist between Mr. Rosier and Miss Reckitt, constituted in law adultery on the part of Mr. Rosier and fornication on the part of Miss Reckitt. The law prescribes adequate punishment for these crimes upon conviction thereof after proper legal procedure. The legal punishment for those crimes is not death. Therefore, the method

Commonwealth *v.* Rosier.

adopted by the defendant for redress of her real or fancied wrongs was illegal, and the slaying of Miss Reckitt was an illegal killing. The law of Pennsylvania does not tolerate a doctrine of transitory frenzy, which does not amount to actual insanity, as a defence to a charge of murder. In the eye of the law a murder committed by a defendant in such a frame of mind indicates only that it was done in vindictive and reckless temper. However, you have the other contention in the case, namely, that because of her suddenly coming upon the two deceased people, in what she describes as a compromising position on the sofa or couch, the defendant was caused to lose her reason, to become insane to such an extent that she had not sufficient capacity to know whether her act was right or wrong, and that it was contrary to the law, and that she was unable to discern right from wrong and could not control her mental powers.

It is the law that in order to excuse the defendant on the ground of insanity—and the burden of proving it is upon her—by fairly preponderating evidence, you must be convinced that at the time when she fired the ball into Miss Reckitt's body her mind was so affected by disease that she did not know the nature and consequence of her act, she did not know that it was wrong and would be punished by law; or that she was so impelled by an insane impulse that she had no power whatever of resisting. You will see, therefore, from what I have just stated to you as the law, that there is a distinction between merely an unsound mind and the condition of insanity that will excuse an illegal killing; for if she did have an unsound mind and yet knew the nature and quality of her act, knew that it was wrong, and knew what she was doing at the time, she would be responsible under the law. Accordingly, unless her mind was so affected by disease that she could not control her actions, or unless her knowledge of what she was doing was destroyed, she is responsible. That is the legal standard and the test, and you must apply it.

A large number of witnesses were examined before you in the defendant's behalf, among them some relatives and an acquaintance of her grandfather. Some of these witnesses testified that, in their opinion, her grandfather was insane, that some of his relatives, I think brothers and sisters, were also insane, and that others of the kin and blood were insane, one of them dying in an insane institution. All of this evidence you will remember and carefully consider. The significance to be attached by you to this evidence of insanity of ancestors, and to the alleged acts of cruelty by Mr. Rosier toward his wife, the defendant, and the conduct alleged on behalf of the husband's brother, and the fact, if it be a fact, of the discovery by the defendant of the carnal relation between her husband and Miss Reckitt at the immediate time of the shooting, is this: Did all these things, if they are true and really existed in fact and actually did happen, have such an effect upon the defendant's mentality as to cause her reason to forsake her to the extent of rendering her insane? In other words, were her ancestors and relatives insane, and did she inherit a tendency to insanity, and did her husband abuse and humiliate her over a period of three months before the killing? Then, to follow out the inquiry, did this defendant conclude to end her life by suicide? Did the defendant purchase the revolver and cartridges within a short time before the shooting for the purpose of using it upon herself and not upon Miss Reckitt? This is for you. If she did, was it with that purpose in mind that she returned to her husband's office, hoping only for a reconciliation, and, upon failure of accomplishment of that purpose, to use the revolver and bullets upon herself and not upon Miss Reckitt? Upon her entering that room, were

2 D. & C.

these thoughts in her mind? Or did she have in her mind the fully-formed purpose to kill and not to commit suicide? This is for you. Did she, then, on entering the room, find her husband and Miss Reckitt in the performance of an indiscretion or of actual sexual intercourse? She says that she did. She and her husband and Miss Reckitt were the only human beings present at that time. Her husband and Miss Reckitt are dead; their lips are sealed; they are unable to give you their versions here in court of what was occurring when the defendant entered that room and what transpired afterward. You have evidence by the orderly at the hospital that Miss Reckitt, shortly before going under operation there, told him that she had no formal statement to make because she and Mr. Rosier were "caught in the act," and that she should have heeded warning to stay away from Mr. Rosier, or words to that effect. Do you believe this evidence? Mrs. Reckitt, on the other hand, testified that shortly before her daughter went under the operation she told her mother that there was no cause for the shooting. Do you believe this evidence? This is for you, gentlemen. If the defendant did find those two people as she alleges, did the sight dethrone her reason to the point of insanity, as I have heretofore instructed you, taken in connection with insanity in ancestors and relatives, and also in connection with abuse and misuse by her husband, and innuendoes and insinuations and improper conduct by her brother-in-law over a period of three months prior? Do you believe that in fact the kin of the defendant were actually insane as described, not by physicians, but by laymen. Do you believe, further, that the defendant did receive the extent and character of abuse by her husband as testified to? Some of the witnesses told you of occurrences of unkind and improper conduct by the husband to the defendant, which they tell you that they themselves witnessed. Others of the witnesses testified only to acts of ill-treatment as narrated to them by the defendant herself. Still other witnesses, as you will recall, testified concerning acts of kindness by the husband—the husband's consideration for his wife during the time of the childbirth, his accompanying her to places of amusement, also in social calls upon other married couples, parties and the other matters in this connection which you will remember. The defendant contends that with the advent of her brother-in-law in their home on the day of the birth of the child, about three months preceding the shooting, the trouble between her and her husband began; that prior to that time her relations with her husband were satisfactory in every way. She tells you that, even when she was in the hospital, her brother-in-law, Arthur, began insinuating that her husband was paying attention to Miss Reckitt, and that within only several days after her return with the baby from the hospital on Oct. 21st, Arthur made indecent and insulting proposals to her, which he continued almost daily down to the day of the shooting. Arthur denies these things, as you will recall. He further tells you the defendant, in talking over with him the incident when Mr. Rosier told his wife that if the quarrels did not cease he would quit and leave her, said that she would "get" her husband before he could get away, or words to that effect. Did this incident occur? This is for you. Do you believe that her demeanor with Arthur during this interval—going to lunches with him, permitting him to help her wash the dishes and prepare the meals—is consistent or inconsistent with her contentions concerning Arthur's conduct? These are all inquiries to which you must direct your attention upon the question whether or not the defendant was actually insane in the sense contemplated by the law as I have given it to you, at the immediate time of the shooting.

As opposed to this evidence, a number of witnesses have been examined

upon the question of sanity of the defendant from the time of the birth of the child up until the time of the shooting and thereafter. I am now referring to the lay witnesses who told you that there was nothing abnormal or extraordinary in the demeanor, behavior, manner of dress, tidiness, and such things, after the birth of the child, as compared with these things before the birth of the child. All of this evidence you will carefully consider and weigh in arriving at a conclusion upon the question of insanity.

Two physicians, called as experts upon mental diseases, told you that they examined the defendant at the Rittenhouse Hotel on Jan. 27th of this year, six days after the shooting, and upon the same day of and following the coroner's inquest, as you will recall; and they have testified before you that, in their opinion, the defendant was insane at the time of the shooting, and that they based their opinions both upon their examinations and upon all the evidence that has been presented in the case. They further testified that it is their opinion that the defendant did not know what she was doing and was not responsible for her acts at the time of the shooting, as I recall their evidence. They also·tell you that they believe that she is now sane. You, of course, will remember just what they did testify to upon the subject and will be guided by your own recollection and not by any statement of mine.

Three physicians called in behalf of the Commonwealth in rebuttal, one of whom described the extent of his examination at the prison of the defendant in February following the shooting in January, testified that it is his opinion that at the time of his examination the defendant was not insane, but was sane. Two others of those three physicians, called as experts by the Commonwealth, told you that, after having heard and read all the evidence in the case, they are of opinion that the defendant was sane at the time of the shooting, and knew what she was doing.

Well, all of this is for you. No one now living saw the defendant at the immediate moment of the shooting. Soon thereafter, however, she was seen by a number of people—first by the man who ran into the room upon hearing the reports of the shots, then the police officers and newspaper reporters who were shortly upon the scene. They have all testified that the defendant appeared to be very much excited and distraught. Did her actions and conduct then indicate insanity, or did it indicate merely the condition of excitement of one who realized what had been done? One of the reporters testified that, upon her knees, the defendant begged him, under the impression that he was a physician, to minister to her husband whom she had injured. Did that indicate that she knew that she had done something that she ought not to have done? Some of the witnesses who were present at the scene shortly after the shooting narrated to you what the defendant said, and the reasons that she gave for her act. They tell you that she wanted to reach her mother over the telephone to Atlantic City. Her mother actually was in Atlantic City at the time, and apparently the defendant knew not only that fact, but also her mother's address in Atlantic City. Upon reaching the hospital shortly after the shooting, she spoke to her husband and to Miss Reckitt. You will recall just what she said and did, as testified to by the witnesses who described those things before you. Upon removal later in the same afternoon to the police station, she wanted to get in touch with an attorney, and asked for one of the most eminent lawyers in this city, according to the evidence of some of the witnesses. What do all these things indicate to your minds upon the question of her sanity or insanity at the time of the shooting, taken in connection not only with the evidence given you by the experts called in behalf of the defendant and of the Commonwealth, but also all the other evidence in the

2 D. & C.

case? You will remember and consider also the evidence bearing upon her acts, conduct and demeanor when received at the County Prison and thereafter. All these matters it is your duty to consider most carefully. What do you yourselves think and find as a fact as to the sanity or insanity of the defendant at the time of the shooting? This is the vital question in the case. Was she insane within the contemplation of the law as I have given it to you? If she was, then she is not guilty, and your verdict will be simply not guilty. On the other hand, was she sane within the contemplation of the law as I have given it to you? If she was sane, then she was responsible for her act, and in that case it is your duty to find her guilty and to fix the degree of the guilt under the evidence and as applied to the law as I have fully instructed you upon it earlier in my charge.

I have not gone into the details of the evidence with you at length. I could serve no good purpose had I attempted so to do. You yourselves have heard it just as I have and know as much about it as I. It is your province to remember it. You would not be bound by my statements of my recollection, if in any particular my recollections should differ from yours. In other words, you are the sole judges of the facts in the case; yours is the sole province to weigh the evidence, to look at the probabilities arising from it, to pass upon the credibility of all the witnesses and to determine where the real truth lies. You will have out with you all the exhibits that have been received in evidence, and they are for your careful consideration in connection with all the other evidence in the case.

I desire to make clear to you at this time the significance that you are to give to a line of testimony that you have heard in the case. You have had evidence concerning the life of the defendant from the time of her conception in the womb of her mother up until the time of the shooting. This evidence was not admitted, nor are you to consider it as having any bearing against the defendant in any aspect of the case. It was admitted neither for the purpose of proving either good or bad character, nor as showing in any sense the commission of the offence with which the defendant is charged before you and for which she is now on trial. The only purpose of that evidence, and you must so yourselves regard it and consider it, is to enlighten you upon the question of whether or not the defendant's whole life, in its vicissitudes up until the time of the shooting of Mildred Reckitt, taken in connection with all the other evidence in the case, contained any act, either of omission or commission, which tends to throw light upon the defendant's frame of mind, whether of sanity or insanity, at the time of the shooting; and also for the purpose of the examination of the expert physicians to elicit the reasons upon which they based the opinions expressed by them on their examinations by the respective sides by which they were called.

Counsel for the defendant have handed me twenty-four points for charge upon the law and the evidence.

As the first point is put, it is declined.

(1. If the defendant, at the time of the shooting, was temporarily insane, she is not guilty of any criminal offence, and the verdict should be not guilty.)

2. If the defendant, at the time she committed the act, had not sufficient capacity to know whether her act was right or wrong, and whether it was contrary to law, she was not responsible for it, and the verdict should be not guilty. *Ans.* This point is affirmed.

3. The test in the case was the power or capacity of the defendant, at the time of the shooting, to distinguish right from wrong, and, although she may at that time have been sane upon every other subject, yet if, at the time of

the shooting, her mind was in such condition that she could not discern right from wrong and could not control her mental powers, she was not responsible for the shooting, and the verdict should be not guilty. *Ans.* This point is affirmed.

The fourth point is declined, as is also the fifth, as put.

(4. If, at the time of the shooting, the defendant was utterly unable to control her will or subjugate her intellect, and by reason thereof the shooting occurred, she is entitled to an acquittal, and the verdict should be not guilty.)

(5. If, at the time of the shooting, the defendant was laboring under such a defect of reason as not to know the nature and quality of the act she was doing, or, if she did it, she did not know she was doing what was wrong, then she should not be convicted, and the verdict should be not guilty.)

6. If, at the time of the shooting, the defendant's reason was so affected that she did not possess the power to distinguish right from wrong, or lacked the power to adhere to the right and abstain from the wrong, she was not, under the law, accountable for her act, she should not be convicted, and the verdict should be not guilty. *Ans.* I affirm this point, referring you, in connection with it, to my instructions in the general charge upon the subject-matter contained in it.

7. If the jury believe that, at the time of the shooting, the defendant's mind was affected to such an extent as to destroy or seriously impair her judgment or consciousness of right or wrong, then her act in shooting the deceased was not criminal, and the verdict should be no guilty. *Ans.* I affirm this point with the qualification that the inability to distinguish between right and wrong, referred to in the points, must have been due to mental disease or insanity, as heretofore defined by me in my instructions upon this subject. If you believe from the whole evidence that the defendant's mental condition at the time of the shooting was merely one of hot blood, based upon sufficient provocation, and if you find beyond a reasonable doubt that the defendant shot Mildred Reckitt while in such a state of mind, your verdict, under the law, would be guilty of manslaughter. With this qualification, the seventh point is affirmed.

8. If the jury believe that, at the time of the shooting, the defendant was laboring under such form of insanity, and it was of such a degree as to blind her as to the natural consequences of her moral duty and destroy her perception of right and wrong, she was not accountable for her act, and the verdict should be not guilty. *Ans.* That point is affirmed.

9. If, at the time of the shooting, the defendant's mind was so disordered that she was impelled by an insane impulse or a spell which she had no power whatever to resist, then she was not responsible for her act, and the verdict should be not guiilty. *Ans.* This point is affirmed, with the qualification that "a spell which she had no power whatever to resist" must be an insane spell, as pointed out to you in my general charge. A spell in the sense of jealous frenzy, madness, or anything else which did not amount to insanity, would not excuse the shooting.

10. If the jury believe from a fair preponderance of the testimony that the defendant did the shooting without knowing what she was doing, she should be acquitted. *Ans.* I will affirm this point.

11. The defence set up by the defendant need not be clearly established. It is sufficient if the jury believe it from a fair preponderance of the evidence. *Ans.* I will also affirm this point.

12. It is not necessary for the defendant to establish beyond a reasonable doubt, or to even clearly establish, that, at the time of the shooting, she was insane or that her mind was disordered; but the jury may acquit her if, from

2 D. & C.

a fair preponderance of the evidence, the jury believe that, at the time of the shooting, she was of such unsound condition of mind that she was unable to discern right from wrong, or unable to control her will or subjugate her intellect. *Ans.* I affirm this point, directing your attention, in connection with it, to my general charge upon this subject.

13. In considering whether the defendant was in such a condition of mind so as to avoid responsibility for her act in shooting the deceased, the jury should take into consideration the testimony relating to the heredity of the defendant. *Ans.* This point is affirmed.

14. In considering whether the defendant was in such a condition of mind so as to avoid responsibility for her act in shooting the deceased, the jury should take into consideration the testimony tending to show that blood relatives of the defendant were insane. *Ans.* This point may be taken in connection with the preceding point, and is affirmed.

15. In considering whether the defendant was in such a condition of mind in order to avoid responsibility for her act in shooting the deceased, the jury should give consideration to the testimony produced at the trial, to the effect that the defendant, prior to the date of the birth of her child on Oct. 8, 1921, was a person neat in appearance and of a cheerful disposition; that while confined in the hospital at childbirth she was informed of the unfaithfulness of her husband; that thereafter she was again informed by her brother-in-law of the unfaithfulness of her husband; that when she confronted her husband with this information, he informed her that it was true and expressed a desire and intention to divorce her; that when she spoke to the woman, Mildred Reckitt, with whom her husband was said to be intimate, this woman admitted the intimacy; that, after receiving the information, she wrote a note to Dr. Harris, informing him of her husband being untrue; thereafter she informed numerous friends and neighbors of her husband's unfaithfulness; that, following the birth of her baby and between that time and the time of the shooting, she became nervous, melancholy and depressed; during that time she paced the floor, wrung her hands, indulged in crying spells, bit her nails, was untidy in person and kept her house in a disordered state; that she threatened to commit suicide, and that on the day of the shooting, after being informed that her husband and his stenographer were in her husband's private office, she went in and found them lying together upon a couch.

16. In considering whether the defendant was in such a condition of mind so as to avoid responsibility, the jury should give consideration to the testimony of the coroner's attaché that on the day the defendant was in his custody, she was nervous and excited; to the testimony of the witness, Mrs. Johnson, keeper in the County Prison, as to what the defendant said to her and as to what her condition was; to the testimony of the physician at the Philadelphia County Prison, to the effect that she stated to another prison official that the defendant was mentally below normal.

17. In considering whether the defendant was in a condition of mind to know the nature of her act at the time of the shooting, the jury should give consideration to the testimony of Dr. Burr, who, in cross-examination, stated that if the matters relating to the information alleged by the defendant to have been imparted to her relating to the unfaithfulness of her husband and her physical appearance and acts, conduct and declarations testified to by witnesses called on behalf of the defendant were true, that such matters would influence her mental condition.

18. In considering the testimony of the witness, Dr. Phillips, called by the Commonwealth, the jury should give consideration to the fact that this doctor,

in forming his opinion as to the condition of mind of the defendant, did not, at the time he formed such an opinion, have knowledge of any history as to the heredity of the defendant, nor did he have any knowledge as to the matters upon which the defendant produced testimony tending to show that her mental condition had been affected by the information conveyed to her as to the unfaithfulness of her husband and the manner in which she had been treated after such information had been conveyed to her by her husband and her brother-in-law, Arthur Rosier. *Ans.* All these points, the fifteenth, sixteenth, seventeenth and eighteenth, have reference to evidence in the case. If, after considering the evidence, you find that it is as stated in these points, you will give to it the weight to which you believe it is entitled as bearing upon the questions before you in the case.

The nineteenth point is declined as put. I have already instructed you at length upon its subject-matter.

(19. The burden of proof in this case is exclusively and continually upon the Commonwealth; and, if one of the facts which constitute an element of the crime with which the defendant is charged is not proved beyond reasonable doubt, there cannot be a conviction.)

20. The defendant is presumed to be innocent, and the burden of proving all the necessary facts in the case is upon the Commonwealth. *Ans.* This point is affirmed.

I am unable to understand the meaning of the twenty-first point as put, and am, therefore, obliged to decline it.

(21. If the jury have a reasonable doubt as to any material circumstance sought to be proved by the Commonwealth, the verdict should be not guilty.)

22. The defendant is not only entitled to any reasonable doubt which may arise upon an ultimate consideration of the evidence in the case, but to the benefit of every reasonable doubt which may enter the mind of a juror upon the consideration of any item of evidence during the progress of the trial. *Ans.* This point is affirmed, referring you to my general charge upon the subject of reasonable doubt.

23. If upon a consideration of the evidence the conscience of a juror hesitates at arriving at a conclusion as to the guilt or innocence of the defendant, such hesitation constitutes, in the law, reasonable doubt, and such reasonable doubt must be resolved in favor of the defendant. If there exists such a doubt, then there cannot be a conviction. *Ans.* This point is affirmed, again referring you in connection with it to my general charge.

24. Every fact necessary to the conclusion asked for by the Commonwealth must be distinctly and independently proved beyond a reasonable doubt by competent and reliable evidence. *Ans.* I affirm this point, again directing your attention in connection with it to my general charge upon the subject-matter of the point.

Now, gentlemen of the jury, a word in conclusion. I have instructed you upon the law applicable to the contentions of the Commonwealth and of the defendant. I trust that I have succeeded in giving it to you so that you comprehend and understand it. I have performed my whole duty as I understand it. Now you are called upon to discharge yours. If, after carefully considering the whole case on the law and the evidence, you come to the conclusion that the defendant at the time of the killing of Miss Reckitt was insane within the contemplation of law as heretofore pointed out to you by me, then in the eye of the law, although it was an unlawful killing, the defendant was not guilty of crime, and your verdict will be not guilty.

2 D. & C.

If, on the other hand, you find that she was sane and was capable of forming and did form the wilful, deliberate and premeditated design to kill, and then did kill, Miss Reckitt, and you are convinced of that fact beyond a reasonable doubt, as reasonable doubt has heretofore been explained to you, then you will find that she was guilty of the crime of murder in the first degree, and on your oaths as jurors you should so declare by your verdict.

Again, if you find as a fact that she was sane, that she did know what she was doing when she fired the fatal shot that killed Miss Reckitt, but that the firing of the shot was not done with a wilful, deliberate and premeditated design to kill, but only to do great bodily harm, and with malice, and if you are convinced of that fact beyond a reasonable doubt, then your finding would be that she is guilty of murder in the second degree, and on your oaths as jurors you would so declare by your verdict.

Finally, if you find as a fact that, although the death of Miss Reckitt was caused by a gun-shot wound at the hands of the defendant, there existed a sufficient cause of provocation and a state of rage or passion without time to cool, placing her beyond the control of her reason and suddenly impelling her to the deed, and that there was no malice, as I have heretofore explained it to you, then she would be guilty of manslaughter, and you would so declare by your verdict.

Gentlemen, the case is with you.

(Counsel for the defendant take the following exceptions at side-bar.)

Mr. Scott: I ask your Honor for an exception to that portion of your charge wherein your Honor states that the killing of Mildred Reckitt was illegal.

The Court: You may have an exception to what I said in that connection.

Mr. Scott: I ask for an exception to your Honor's instruction upon the question of first degree murder, also upon the question of second degree murder.

The Court: You may have those exceptions.

Mr. Scott: I ask for an exception to that portion of your Honor's charge where your Honor refers to the conduct of Mildred Reckitt and Mr. Rosier on the couch, and I ask for an exception to that portion of your Honor's charge where you instruct the jury to find as a fact whether such conduct as your Honor mentions in your charge taking place on the couch in fact took place, and ask your Honor to charge the jury that it is not a question of fact in this case.

The Court: I do not understand just exactly what you mean, but you may have an exception to my charge in so far as it relates to what took place on the couch.

Mr. Scott: The question is the condition of the mind of the defendant, and whether she believed these acts to exist, and whether such belief caused the disorder, whether true or not.

The Court: You may have an exception to the part of my charge that I think you mean to cover.

Mr. Connor: We also ask for an exception to all of your Honor's instruction in the charge touching upon manslaughter and the definition of manslaughter in the case. I think your Honor referred to it three times.

The Court: You may have that exception.

Mr. Connor: Also that part of your Honor's charge where you said that one who uses a deadly weapon intends to cause death.

Commonwealth *v.* Rosier.

The Court: I did not say it in that way. I said the use of a deadly weapon, shooting at a vital spot, is within contemplation of law sufficient to base a finding that death was what was intended. You may have an exception to what I did say upon that point.

Mr. Connor: Also an exception to that portion of your Honor's charge where you spoke about a juror speculating.

The Court: You mean in my instructions upon the question of reasonable doubt?

Mr. Connor: Yes, sir.

The Court: You may have an exception to what I said in that connection.

Mr. Connor: Also to that part of your Honor's charge in which you said none of these things, meaning the matters related by the defendant as affecting her mentality, alone would constitute a defence.

The Court: You may have an exception to what I said in that connection.

Mr. Connor: Also we ask for an exception to that part of your Honor's charge where you said that, even if the defendant found them in intercourse, the law would not justify the killing.

The Court: You may have an exception to what I said in that connection; not, of course, to any one little phrase, but to the whole of the thought in that connection.

Mr. Connor: Yes, sir; that is what I mean. We also ask for an exception to that part of your Honor's charge where you said criminal intercourse by the husband constituted adultery, and by Miss Reckitt fornication, and that the killing was an illegal killing.

The Court: You may have an exception to all that I said in that connection.

Mr. Connor: We also ask for an exception to that part of your Honor's charge where you said that transitory frenzy does not justify a killing.

The Court: You may have the exception.

Mr. Connor: Also to that portion of your Honor's charge where you said, in order to excuse on the ground of insanity at the time of the killing, it must appear that she was so affected by disease that she did not know the nature of her act. We also ask for an exception to that part of your Honor's charge dealing with the definition of unsound mind, which you said would not constitute a defence, and then your instruction upon insanity which you said would constitute a defence.

The Court: You may have an exception to exactly what I said in the two connections to which you refer.

Mr. Connor: We also ask for an exception to that part of your Honor's charge where you said that unless her mind was so affected that she could not control her actions and could not tell that her act was wrong, she would still be responsible.

The Court: You haven't that the way I put it, I see. I know what part of my charge you refer to, and I will give you an exception to that.

Mr. Connor: We also ask for an exception to that part of your Honor's charge where you said the jury were to consider whether the defendant concluded to commit suicide, or did she purchase the revolver to commit suicide, and then did she find her husband and Miss Reckitt in the act of illicit intercourse.

The Court: You may have an exception to what I said in that connection.

Mr. Connor: We also ask for an exception to that part of your Honor's charge relating to the life of the defendant and what effect the jury should give to it.

2 D. & C.

The Court: You may have an exception to that.

Mr. Connor: And then, we also ask for an exception to the refusal to affirm the first, fourth, fifth, nineteenth and twenty-first points presented on behalf of the defendant, and also exceptions to your Honor's qualifications of the sixth, seventh, ninth, twelfth, twenty-second, twenty-third and twenty-fourth points presented on behalf of the defendant.

The Court: You may have all the exceptions you have asked for.

Mr. Connor: And now I move that an order be made that the official stenographer transcribe the notes of testimony and charge of the court and file them.

The Court: That will be done at your motion.

Mr. Scott: Would your Honor also grant an exception to your charge because of its inadequacy?

The Court: I will give you a general exception to my charge upon that ground.

(The jury retire for deliberation, and later return and render their verdict.)

(Verdict, not guilty.)

COMMONWEALTH OF PENNSYLVANIA *v.* CATHERINE ROSIER.

February Sessions, 1922.   Nos. 288, 290.

Charge: Murder; voluntary and involuntary manslaughter.

Mr. Speiser: If the court pleases, I have here the bills of Commonwealth *versus* this defendant, Catherine Rosier, February Sessions, 1922, Nos. 288 and 290, charging the defendant with the murder of Oscar W. Rosier, and with the voluntary and involuntary manslaughter of Oscar Rosier.

This jury having found this defendant not guilty on the ground of insanity upon the bill charging her with the murder of Mildred Reckitt, upon the ground of insanity, the district attorney feels that since the killing of Oscar Rosier occurred at the same time and under the same circumstances, the fact of insanity is *res adjudicata,* and, although we do not agree with the finding of this jury, we feel that it is our duty to ask your Honor to permit us to submit these bills against this defendant for verdicts of not guilty.

The Court: The court heartily approves of this application. This defendant is charged with having murdered her husband at the same time that Miss Reckitt was killed, and under the same circumstances. It would make no difference if there were fifty people who had been killed by the defendant at the same time, the question would be *res adjudicata* as to her mental condition at the time of the killing, in view of the finding of this jury. This jury could acquit this defendant only upon the ground that she was mentally unsound within contemplation of the law at the time of the killing of Mildred Reckitt. The jury having found by its verdict that she was mentally unsound at the time, that matter is *res adjudicata* for every other killing done at the same time and under the same circumstances. It would, therefore, be a waste of time to put her upon trial upon the two bills that you now have, and I think, also, that it would be improper to hesitate about it and in the meantime keep her in prison. I, therefore, agree with the District Attorney that it is proper to submit the remaining bills for verdicts of not guilty, and I, therefore, instruct you, Mr. Speiser, to submit them.

(Verdicts, not guilty.)